**STATE of Tennessee, Appellee,**

v.

**Virgil KEELS, Appellant.**

Court of Criminal Appeals of Tennessee, at Knoxville.

Feb. 5, 1988.

Permission to Appeal Denied by Supreme Court June 27, 1988.

Rodney C. Strong, Chattanooga, for appellant.

W.J. Michael Cody, Atty. Gen. & Reporter, Bettye Springfield Carter, Asst. Atty. Gen., Nashville, Jeff Hollingsworth, William West, Asst. Dist. Attys. Gen., Chattanooga, for appellee.

## OPINION

JAMES C. BEASLEY, Special Judge.

The defendant, Virgil Keels, was convicted by a Hamilton County jury of murder in the second degree and subsequently sentenced to confinement for fifty (50) years. He has appealed as of right and raises three issues including a challenge to the sufficiency of the evidence.

For approximately one week the defendant had been staying at a motel owned by the victim of this homicide, George Maffett, Sr. During this period of time the defendant had been a frequent visitor at the Maffett residence which was located on Fisk Avenue approximately one hundred yards from the motel.

Floyd Wardlaw, a cousin and neighbor of Mr. Maffett, testified that he was in his yard on the afternoon of February 28, 1986, when he heard his cousin screaming for help. As he ran toward the Maffett house he could see Mr. Keels and Mr. Maffett on the front porch. Wardlaw stated that he saw Keels hitting Maffett with a lamp. He stated that Mr. Maffett had his hands down by his side and was not fighting back. After striking several blows

with the lamp, the defendant dropped it and picked up a metal ashtray stand and continued to strike Maffett about the head until he fell or was knocked off the porch. While the victim was down on the sidewalk the defendant stood over him and continued to strike him with the ashtray stand. The witness overheard the defendant say, "I'm going to kill you" as he stood over the victim.

The witness testified further that when he asked the defendant to stop hitting the victim, the defendant drew the stand back and started toward him but then backed off and walked over to the victim's automobile. Wardlaw stated that he left to get help and when he looked back he saw the defendant with his hand in the victim's pocket.

The victim's son, Albert G. Maffett, who lived nearby, was located and promptly came to the scene. He found his father lying on his back in the yard near the porch. He testified that his father was barely breathing and was so bloody he could hardly recognize him. He shook his father and asked him what happened. The victim's first words were, "Son, I'm dying. I'm going to leave you." When asked again what happened he stated that he and the defendant had been sitting at the table eating. Shortly after the defendant got up to go to the bathroom he felt something cold, stoned him, just blinded him and he fought for his way to the front door to holler for help.

This witness admitted that he took an unloaded pistol from his father's left front pocket and later gave the gun to his brother. He did not tell the police about this weapon "because they didn't ask him" and "because it wasn't visible."

The victim was transported to the hospital where he died approximately seventeen hours later from cardiac arrhythmia. The medical examiner attributed the death to the blunt force injuries to the head which brought on the heart failure. His examination revealed that the victim had six to eight splits in the skin around the left temple, six splits in the skin at the back of the head, other injuries to the face and head, and a broken nose. Cuts on the victim's hands could have resulted from striking someone or they could be defensive wounds.

Detective Fred Stafford was assigned to investigate the case and went directly to the hospital where the defendant and Mr. Maffett were being treated. He stated the only injury visible on Mr. Keels was a small skinned place on a right knuckle. The defendant was vomiting and appeared to be somewhat intoxicated. While investigating the scene the detective found a large metal iron from the fireplace on the floor next to the living room door. There were hair particles and what appeared to be dried blood on the iron.

The first witness called by the defense was Charlie Nunn, Jr. He told of being at the Maffett home and drinking with the defendant, the victim and others on the evening of February 27. He was also at the house the next day from around 10:30 a.m. until 1:00 p.m. He testified that everyone was in a good mood when he left. He returned shortly after the incident and described the inside of the house as "looking like something out of a horror movie with blood all over the place."

It was shown through testimony from this witness that the victim owned and customarily carried a pistol; however, on the date of the altercation he saw the pistol along with the victim's pipe tobacco in the console of the victim's car. When the defendant missed his tobacco he sent the defendant to the car to get it.

The defendant testified that when he arrived in Chattanooga on Thursday, February 20, 1986, he contacted George Maffett to whom he had been referred by a mutual friend. Maffett agreed to "put him up until he could secure himself financially." He said George considered him a house guest and used the motel as a convenience because of the lack of bedrooms at the house. He described a most harmonious relationship with Maffett which continued until the altercation which led to Maffett's death.

According to the defendant's version, the two men were seated at the dining room table when they became engaged in a heat-

ed exchange concerning a phone conversation between the defendant and one of Mrs. Maffett's lady friends. When George reached across the table and slapped him in the face, he responded by hitting Maffett in the face. Maffett fell from his chair and struck his head on the wall. Maffett was in a dazed condition and announced his intention to kill the defendant. During the ensuing violent struggle the defendant contends that he was fighting to keep Maffett from getting his pistol which at first he thought was in his pocket and then decided that it was in the car. He stated that during the fight they were hitting each other with various items. He denied striking the victim after they left the porch and denied placing the gun in the defendant's pocket after the altercation.

Based on this evidence the jury rejected the charge of murder in the first degree and convicted the defendant of murder in the second degree.

In his challenge to the sufficiency of the evidence the defendant argues first that it is apparent from the proof that he was fearful the deceased was attempting to get a gun which was known to be in his possession and secondly that the actions taken were in the course of a general fight and would therefore support a verdict of voluntary manslaughter but not murder in the second degree.

■ The essential element required to distinguish second degree murder from voluntary manslaughter is the presence or absence of malice at the time of the killing. *Wilson v. State,* 574 S.W.2d 52, 55 (Tenn. Crim.App.1978). Malice is an intent to do an injury to another; a design formed in the mind of doing mischief to another. *State v. Taylor,* 668 S.W.2d 681 (Tenn. Crim.App.1984).

■ The law of self-defense is not available in a homicide case unless the defendant has a genuine and well-founded fear that he was in danger of death or great bodily harm and that the actions he took were necessary. *State v. Wilson,* 556 S.W. 2d 232 (Tenn.1977).

■ The issues of self-defense and degree of homicide are for the jury to decide in the light of all the circumstances of the killing. *State v. Gilbert,* 612 S.W.2d 188, 190 (Tenn.Crim.App.1980). In deciding these issues, the jury was free to believe the testimony of some of the witnesses and not that of other witnesses, or they could believe a part of a witness' testimony and reject part of a witness' testimony. *Wilson v. State,* supra at 55.

■ From the evidence present here the jury could have found that this was a vicious unprovoked attack by the defendant. Even if they had found that the first blow was struck by the deceased, evidence of repeated blows with a metal stand which continued after the deceased was on the ground plus the stated intention to kill by the defendant would clearly support a finding that this was a malicious killing. At any rate, by its verdict the jury has rejected the defendant's claim that he acted in self-defense or upon adequate provocation. When considered in the light most favorable to the State, we find that this record contains ample evidence from which the jury could find the defendant guilty beyond a reasonable doubt of murder in the second degree. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); T.R. A.P. 13(e).

We will next consider the defendant's claim that the trial court erred in admitting the statement of the deceased to his son as a dying declaration.

■ Under Tennessee law, a dying declaration is admissible only upon a showing that the declarant was conscious of the peril of his situation and that he believed that his death was impending. *State v. Branam,* 604 S.W.2d 892, 895 (Tenn.Crim. App.1980). In determining the sense of impending death necessary to make a statement of a victim admissible in evidence as a dying declaration, the court may look to the language of the deceased or infer from the character of the wounds as showing the consciousness of impending death. *Hawkins v. State,* 220 Tenn. 383, 417 S.W.2d 774 (1967).

■ In this case it was shown that at the time the victim made the complained of statement he was lying in the yard beaten and bloodied almost beyond recognition. The son stated that his father was "just barely breathing." When roused and before responding to the inquiry about what had happened to him, the victim stated, "Son, I'm dying. I'm going to leave you." Although death did not occur until sixteen or seventeen hours later there is no indication that the victim was ever conscious again or spoke further. In fact, the only proof in this regard is that the investigating officer was unable to talk with the victim at the hospital because of his condition.

We find no abuse of discretion in the trial court's decision to admit the statement into evidence under the dying declaration exception to the hearsay rule.

■ The defendant was sentenced as both a persistent and an especially aggravated offender. In his final issue the defendant says there was no qualified evidence upon which to sentence him as an aggravated offender and seeks modification of the judgment to reflect a sentence as a persistent offender only. We feel that this issue has merit.

Several months before trial the State filed a notice for sentencing for an especially aggravated offender alleging therein that the defendant was on parole from the State of North Carolina when he committed this offense.

At the sentencing hearing the prosecution tendered a letter from the manager of records for the North Carolina Department of Correction. An addendum typed below the signature notes, "Subject (Virgil Vance Keels, 20636–OH) was on parole from January 27, 1986 until April 25, 1986 at which time he was terminated." Objection to the introduction of the letter was sustained and the trial judge initially ruled that the record failed to establish an especially aggravated offense. However, after reviewing certified copies of the defendant's convictions from the State of North Carolina he reversed himself holding that from those documents he had concluded that the defendant would have been on parole or equivalent release at the time of the commission of the instant offense. He specifically found from those records that the defendant received two consecutive three-year sentences for credit card offenses occurring on April 19 and April 20, 1983, and reasoned that since the sentences would not expire until 1989 the defendant must have been on parole on February 28, 1986.

Although not called as a witness the defendant interrupted the proceedings on several occasions with comments and unsworn statements. He denied that he had ever been on parole. He claimed that under the "fair sentencing act" of North Carolina, a sentence is cut in half upon entry into the correctional facility and that having received an additional ninety days credit his sentence had expired in January 1986.

A finding of an especially aggravated offense must be beyond a reasonable doubt. T.C.A. § 40–35–107(7). We do not believe this record supports the required quantum of proof. Totally disregarding the remarks of the defendant, one could just as easily speculate that the defendant's release could have resulted from a pardon or commutation, a reversal of his conviction or even from an escape. The State failed to meet its burden here and this issue must be sustained.

Although the transcript of the sentencing hearing clearly shows that the defendant was sentenced as a persistent offender for an especially aggravated offense, the judgment form which is included in the appellate record reflects that he was sentenced as a standard offender. Accordingly, we direct the entry of a corrected judgment reflecting a sentence as a persistent offender.

As modified, the judgment is affirmed.

SCOTT and BIRCH, JJ., concur.