IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 17, 2002 Session

**STATE OF TENNESSEE v. ANTHONY TONY SANDY**

**Direct Appeal from the Circuit Court for Lawrence County
No. 21529    Robert L. Jones, Judge**

---

**No. M2001-02376-CCA-R3-CD - Filed January 30, 2003**

---

Defendant, Anthony "Tony" Sandy, was indicted by the Lawrence County Grand Jury for first degree murder. Defendant was convicted by a jury of the lesser-included offense of voluntary manslaughter. The trial court sentenced Defendant, as a Range I standard offender, to serve four years and six months in the Tennessee Department of Correction and imposed a fine of $10,000, which was assessed by the jury. In this appeal as of right, Defendant argues that the evidence at trial was insufficient to support a finding of guilt beyond a reasonable doubt and that the trial court erred in sentencing Defendant. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3, Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

Robert D. Massey, Pulaski, Tennessee, for the appellant, Anthony Tony Sanders.

Paul G. Summers, Attorney General and Reporter; Helena Walton Yarbrough, Assistant Attorney General; T. Michel Bottoms, District Attorney General; and James G. White, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Facts**

On October 9, 1999, St. Joseph Police Chief Dennis Daniels was dispatched to Defendant's residence. When he arrived, shortly before midnight, he found Larry "Bo Jack" Jackson, the victim, sitting on the couch, drenched in blood. Defendant was sitting beside the victim on the couch with his arms around the victim. The victim had been shot in the head while sitting on the couch. The bullet entered the corner of the victim's right eye and exited between his left ear and neck. A gun was found lying on the back of the couch, directly behind the victim's head. The victim's feet were

crossed, and he was holding, in his left hand, a cigarette that had burned down to the filter, and there were cigarette ashes on his pants.

Police Chief Daniels testified that he took a statement from Defendant on the day following the shooting. In his statement, Defendant told police that the victim and David Gann came over to his house around 11:30 a.m. on October 9, 1999. The three men drank beer and watched football all day. That evening, the victim and Gann left Defendant's house to go to the liquor store in Pulaski. Around the same time, Defendant went to another store to buy beer. When they all returned, they sat and watched television. Gann fell asleep, then woke up and left shortly before 10 p.m. Defendant went to bed, and the victim stayed on the couch. Defendant told Chief Daniels that he did not remember hearing a gunshot, but something startled him awake. He remembered trying to hold the victim up and calling for help. He had not fired the gun that night, and there was no possibility that the gun fired accidentally from his "playing" with it because he never plays with guns. Defendant told Chief Daniels that he did not know how the victim had been shot. Defendant normally keeps his gun beside him on the couch, but he laid it on the coffee table earlier that night.

Wayne Wesson, a criminal investigator with the Tennessee Bureau of Investigation (TBI), was dispatched around 11:40 p.m. on October 9, 1999, to Defendant's home. He spoke to Defendant that same night, and Defendant told him that the victim and Gann had been at his house all day watching football and drinking. When the victim and Gann returned from the liquor store, they all watched television. Defendant began to "doze off." He did not know how the victim had been shot. All he could remember was holding the victim and trying to stop his bleeding. At one point, Agent Wesson overheard Defendant talking to himself, saying, "I've killed somebody. I've killed somebody." Agent Wesson did not question Defendant about the statement. Defendant allowed Agent Wesson to photograph him, and he consented to a gunshot residue test.

Laura Hodge, with the TBI crime laboratory, performed a gunshot residue test on Defendant, which she testified was inconclusive. She also testified that blood can wash away gunshot residue, and Agent Wesson testified that gunshot residue may also rub off by putting hands in pockets. No gunshot residue test was performed on David Gann or the victim.

Officer Chuck Neese, with the St. Joseph Police Department, testified that he and other officers arrived at David Gann's residence in the early morning hours of October 10, 1999. They knocked on his door numerous times, shined a spotlight on his house, flashed their blue lights, blew the horn, and sounded the siren, but nobody answered the door. They tried to wake Gann for approximately ten minutes. They sought a search warrant before going to his house that night, but they could not locate a judge to issue one.

David Gann testified that he arrived at Defendant's house around noon on October 9, 1999. The victim, Defendant, and he spent the day watching football and drinking beer. At around 5 or 6 p.m., he and the victim went to Pulaski to purchase whiskey. Gann testified that when he and the victim returned from the liquor store, Defendant was angry because they had bought only whiskey and no beer. Gann sat in the chair across from the couch where Defendant and the victim were both

sitting. He felt sick from having eaten tacos while they were out, and he began to "doze off" watching television. He heard a "click, click" sound, and he looked over and saw Defendant "messing around" with his pistol, pointing it at the victim and saying, "I ought to shoot you or something for not bringing no beer back." The pistol was not loaded at that time. The victim was smiling and he did not to appear to be afraid or threatened. A few minutes later, Gann left to go home.

Gann arrived home sometime between 9:30 and 10 p.m. He went straight to bed. He did not hear the police come to his house later that night and attempt to wake him with sirens and flashing lights. Syble Gann, David Gann's mother, lives about 100 yards from her son. She testified that on the night of October 9, 1999, her son was at home by 10 p.m. Later that night, she heard horns honking and people shouting. She did not hear anyone say "police," and she did not see blue lights. She did not go outside because it was late and she lives alone. The next morning, she told her son that there had been a shooting at Defendant's home.

Agent Wesson interviewed Gann the following day. During the interview, Gann did not mention that Defendant had been "messing around" with the gun. Gann also told Agent Wesson that he did not see any guns lying around the house that night. At trial, Gann testified that the reason for his omissions to Agent Wesson was that he did not want anything to happen to Defendant. Gann's conscience, however, began to bother him after the initial interview, so he contacted Agent Wesson again a few days later and told him about the incident with the pistol. Agent Wesson searched Gann's home and truck and collected the clothes that Gann said he had worn the night before. The only witness to testify as to what Gann had worn the night before was his mother. She testified that she had seen her son around 3 p.m. on the afternoon of October 9, 1999, and he was wearing blue jeans and a short sleeved shirt. Those are the clothes that Agent Wesson took from Gann's house.

Agent Wesson testified that the pistol with which the victim was shot was found lying on the couch directly behind the victim's head. He also testified that he found a box of ammunition, the same kind as that used to kill the victim, lying open on Defendant's kitchen table. The pistol was found "decocked." Shelly Betts, with the TBI crime laboratory, testified that the pistol has three safeties, and in order to "decock" the gun, it takes two hands. The gun had fired the bullet that killed the victim, and one additional bullet was found in the chamber of the gun. No identifiable fingerprints were found on the gun.

Doctor Charles Harlan, the medical examiner who performed the victim's autopsy, testified that the victim's blood alcohol content was .28 percent. He also testified that, in his expert opinion, the gun was fired from more than twenty-four inches away because there were no "gunpowder burns" on the victim's face.

Agent Wesson, an expert at recreating crime scenes, could not determine the exact position in which the victim was sitting when he was shot. Wesson testified that the bullet that killed the victim was found lodged in the door to the left of where the victim was sitting on the couch. Drawing a straight line between the victim's exit wound and the location of the lodged bullet

indicated that the victim was sitting slightly forward on the couch, rather than with his head against the back of the couch. This is because the couch had a wing arm. Had the victim's head been against the back of the couch, the bullet would have lodged in the arm of the couch.

Gann testified that the victim and Defendant were good friends and had grown up together, and he "couldn't see just messing around and being friends like that, how people cut up and stuff, any reason why he would, you know, would have shot him, you know, why either one of them would have got mad enough to do anything like that." He testified that Defendant and the victim had not been in any kind of serious argument that night, and that, at most, they were merely "jawing," like friends do. Gann also testified that he has seen people "playing with guns and accidentally shoot their TV or a hole in the door, through the ceiling. I've seen it happen many times and many places." He testified that he had "seen a lot of crazy people with guns, you know, and got – been close to being shot before by people being drunk, I mean, drinking like that. So that was one of the biggest reasons I took off."

**Sufficiency of the Evidence**

Defendant argues that the evidence at trial was insufficient to support his conviction for voluntary manslaughter. When an accused challenges the sufficiency of the convicting evidence, we must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Keough*, 18 S.W.3d 175, 180-81 (Tenn. 2000) (*quoting Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979)). In so determining, this Court must review the evidence in a light most favorable to the prosecution, affording it the strongest legitimate view of the evidence in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Keough*, 18 S.W.3d at 181 (*citing State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). Questions regarding the credibility of the witnesses, the weight to be given the evidence, and any factual issues raised by the evidence are resolved by the trier of fact, not this Court. *Bland*, 958 S.W.2d at 659. Furthermore, a guilty verdict replaces the presumption of innocence with a presumption of guilt, which defendant has the burden of overcoming on appeal. *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973).

The standard for appellate review of the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence. *State v. Johnson*, 634 S.W.2d 670, 672 (Tenn. Crim. App. 1982). Furthermore, circumstantial evidence alone may be sufficient to sustain a conviction. *State v. Tharpe*, 726 S.W.2d 896, 899-900 (Tenn. 1987); *State v. Buttrey*, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988). The circumstantial evidence, however, must exclude every other reasonable theory or hypothesis except that of guilt. *Tharpe*, 726 S.W.2d at 900. Like other factual questions, the determination of whether all other reasonable theories or hypotheses are excluded by the evidence is primarily a question of fact for the jury. *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958).

Defendant was charged in the indictment with committing premeditated first degree murder. The trial court properly instructed the jury as to the crimes of first degree murder, second degree

murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide. Based upon the evidence, the jury found Defendant guilty of voluntary manslaughter.

A conviction for voluntary manslaughter requires proof beyond a reasonable doubt that Defendant either knowingly or intentionally killed the victim "in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a) (1997). A person acts "knowingly" with respect to a result of his conduct when he is aware that the conduct is reasonably certain to cause the result. Tenn. Code Ann. § 39-11-106(a)(20) (1997). A person acts "intentionally" with respect to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. Tenn. Code Ann. § 39-11-106(a)(18) (1997).

Defendant argues that there is no evidence to support the jury's conclusion that Defendant acted in the heat of passion or that he was adequately provoked. Defendant asserts that the highest degree of homicide for which the evidence supports a finding of guilt beyond a reasonable doubt is reckless homicide, which is defined as "a reckless killing of another." Tenn. Code Ann. § 39-13-215(a) (1997).

The issue of what degree of homicide for which a defendant is guilty is for the jury to decide in view of all the facts of the case. *State v. Keels*, 753 S.W.2d 140, 143 (Tenn. Crim. App. 1988). The determination that Defendant was adequately provoked is within the province of the jury. *State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995). The critical evidence in this case was the testimony of David Gann that the victim, Defendant and he had been drinking all day. Gann testified that when the victim and he returned from the liquor store not having bought any beer, it angered Defendant. Gann further testified that shortly before he left Defendant's home, Defendant was "messing around" with the gun, pointing it at the victim and threatening, "I ought to shoot you for not bringing no beer back." The jury could infer that Defendant was angered and upset by the victim's actions. Furthermore, the jury is entitled to disregard Gann's testimony that Defendant and the victim were only joking and draw a different conclusion from Gann's testimony that he left shortly after Defendant picked up the gun and threatened the victim with it. We conclude that this evidence is sufficient to support the jury's finding that Defendant was sufficiently provoked and that he acted in the heat of passion.

Regardless of how strong the evidence was in this case, the Tennessee Supreme Court has held that where "a defendant could have been convicted of a higher degree of homicide," he may not complain of having been convicted of a lesser offense. *State v. Smith*, 695 S.W.2d 527, 529 (Tenn. 1985). Voluntary manslaughter is a lesser-include offense of first degree premeditated murder. *State v. Sims*, 45 S.W.3d 1 app. at 20-21 (Tenn. 2001) (affirming the appellate court's holding that voluntary manslaughter is a lesser-included of first degree murder under the *Burns* statutory elements test). In *Howard v. State*, 506 S.W.2d 951, 954 (Tenn. Crim. App. 1974), this Court concluded that where the jury was warranted in convicting the defendant of second degree murder, it could elect to convict the defendant of voluntary manslaughter, even if the facts did not comport with the technical definition of the crime.

Second degree murder is statutorily defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (1997). "Knowing" has the same definition for second degree murder as it has for voluntary manslaughter. *See* Tenn. Code Ann. § 39-11-106(a)(20) (1997). In our view, the jury could have convicted Defendant of knowingly killing the victim.

Viewed in a light most favorable to the State, the evidence shows that Defendant knowingly killed the victim. The gun with which the victim was shot belonged to Defendant. Defendant had been handling the gun shortly before the shooting. A box of ammunition was lying open on Defendant's kitchen table. The gun was not loaded at approximately 9 p.m., when David Gann saw Defendant aiming it the victim and "clicking" it. The gun was found lying on the couch behind the victim's head, having fired one bullet, with one remaining in the chamber. It was found "decocked," which requires the use of two hands. The victim was holding a burned down cigarette in his left hand and ashes had fallen onto his leg, indicating that the victim did not shoot himself. There was no evidence of a fight or confrontation. Dr. Harlan testified that the victim was shot from a distance of more than twenty-four inches away and he did not have any stippling on his face. The victim was shot in the right eye, and the bullet exited through his left ear and lodged in the door frame to the left of where he was sitting. Agent Wesson testified that the trajectory of the bullet indicated that the gun was shot from the right of where the victim was sitting. David Gann testified that Defendant had been sitting to the right of the victim on the couch all night and was still sitting there when Gann left Defendant's house.

We conclude that a rational trier of fact could find the essential elements of the crime of second degree murder beyond a reasonable doubt. The jury could have concluded that Defendant knowingly killed the victim based on the evidence that Defendant was the last person in possession of the pistol, that it was unloaded when Gann left Defendant's house, and that Defendant later loaded the gun and shot the victim in the head. Defendant is not entitled to relief on this issue.

### SENTENCING

Defendant contends that the trial court erred in sentencing him. Defendant was sentenced as a Range I standard offender, to four years and six months for his voluntary manslaughter conviction, to be served in the Tennessee Department of Correction. The trial court denied Defendant's request for probation or any other form of alternative sentencing.

We review a defendant's challenge to the length or nature of his sentence *de novo* with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d) (1997). The presumption of correctness is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting a *de novo* review, we consider the following factors: (1) the evidence, if any, received at trial and the sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristic of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the defendant in his own behalf; and (7)

the potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-210 (1997). Defendant bears the burden of showing that his sentence was improper. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments; *see also State v. Griffin*, 914 S.W.2d 564, 567 (Tenn. Crim. App. 1995).

**Length of Service**

Defendant was convicted of voluntary manslaughter, a Class C felony. Tenn. Code Ann. § 39-13-211(b) (1997). He was sentenced as a Range I standard offender, for which the applicable sentencing range for a Class C felony is three to six years. Tenn. Code Ann. § 40-35-112(a)(3) (1997). For a Class C felony, the presumptive sentence is the minimum in the range when no enhancement or mitigating factors are present. Tenn. Code Ann. § 40-35-210(c) (1997). If enhancement factors exist, but there are no mitigating factors, the trial court must start at the minimum sentence within the range and enhance the sentence within the range as appropriate for the enhancement factors. The trial court shall then reduce the sentence within the range as appropriate for the mitigating factors, if any. Tenn. Code Ann. § 40-35-210(d), (e) (1997).

In determining the length of Defendant's sentence, pursuant to Tenn. Code Ann. § 40-35-114, the trial court applied enhancement factors (1) and (9) and disregarded factors (6), (10), and (11). The trial court considered Defendant's previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate sentencing range. Tenn. Code Ann. § 40-35-114(1) (1997). Specifically, the trial court considered Defendant's 1993 conviction for possession of a weapon with intent to go armed, his 1995 convictions for public intoxication and resisting arrest, and another 1998 public intoxication conviction. The trial court emphasized that the convictions, while they are all misdemeanors, are particularly relevant under the facts and circumstances of this case because Defendant's prior record shows a history of alcohol abuse and unlawful gun possession. Defendant was intoxicated on the night of the shooting, and the trial court noted, "when you look at this particular crime, mixing guns and alcohol doesn't work. It's worse than mixing vehicles and alcohol because it's likely to cause death or serious bodily injury."

The trial court also properly determined that Defendant's use of a firearm during the commission of the offense was an appropriate enhancement factor. *See* Tenn. Code Ann. § 40-35-114(9) (1997). As in a conviction for second degree murder, the use of a firearm is not an essential element of voluntary manslaughter. *See State v. Shelton*, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

The State argued for the trial court's application of enhancement factors (6), (10), and (11), that the personal injuries inflicted upon the victim were particularly great; that the defendant had no hesitation about committing a crime when the risk to human life was high; and that the felony resulted in another person's death and the defendant had previously been convicted of a felony that resulted in death or bodily injury. Tenn. Code Ann. § 40-35-114(6), (10), (11) (1997). The trial court properly rejected those enhancement factors. The trial court determined that factors (6) and (11) do not apply because death is a necessary element of a homicide offense and should not be further used by the court to increase the punishment. The trial court gave no consideration to factor

(10) because the evidence did not establish that Defendant had no hesitation about committing a crime when the risk to human life was high. We find no reversible error in the trial court's determinations regarding the application of these enhancement factors.

The trial court gave little, if any, weight to the following mitigating factors: (1) that substantial grounds exist to excuse or justify the conduct while failing to establish a defense, Tenn. Code Ann. § 40-35-113(3); (2) that Defendant assisted authorities in locating or recovering any property or person involved in the crime, Tenn. Code Ann. § 40-35-113(10); and (3) that the crime was committed under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct, Tenn. Code Ann. § 40-35-113(11).

Defendant argues that his intoxication at the time of the offense supports the application of mitigating factor (3), that substantial grounds exist tending to excuse or justify the defendant's conduct while failing to establish a defense. The trial court gave some consideration to the factor, recognizing that Defendant was intoxicated at the time of the crime, but determined that "Mr. Sandy, having been drunk so many times before, should have known not to have been drinking to that extent and especially while there were firearms in the house. But it is a factor in mitigation." This Court has previously held that voluntary intoxication is not an acceptable ground upon which to sustain the use of this mitigating factor. *See State v. Ricky Harlin Neal*, 1999 Tenn. Crim. App. LEXIS 328, No. 01C01-9806-CR-00270 (Tenn. Crim. App. at Nashville, April 8, 1999), *no app. for perm. to appeal filed*.

With respect to mitigating factor (10), that Defendant assisted authorities in locating and recovering property involved with the crime, we agree with the trial court's determination that little, if any, weight should be afforded this mitigating factor. The evidence shows that Defendant called his mother, who in turn, contacted the police, and the gun was found lying on the couch behind the victim's head. The trial court noted that Defendant "didn't go much beyond that and he's never assumed any responsibility for his conduct that this Court knows of. . . ."

The trial court also rejected Defendant's argument that the offense was committed under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct, mitigating factor (11). Again, Defendant asserts his intoxication in support of the application of this mitigating factor. The trial court found that Defendant's "getting drunk and displaying or threatening people with firearms is not an unusual event." The evidence presented at the sentencing hearing shows that Defendant has, on several occasions, displayed and even "pulled guns" on other people while intoxicated. David Gann testified at trial, and again at the sentencing hearing, that he decided to leave Defendant's house on the night of the shooting when he saw Defendant pull out his gun. We agree with the trial court that Defendant's intoxication does not qualify as an "unusual circumstance," and therefore, does not support the application of this mitigating factor.

Defendant complains that the trial court should have considered his cooperation with the investigation by giving three statements to law enforcement under the catch-all provision of Tenn.

Code Ann. § 40-35-113(13) (1997). The trial court denied application of this factor, finding that Defendant was "evasive and [has] not admitted any responsibility for the death of [the victim]."

The trial court properly stated in the record its conclusions of law and findings of fact. The trial court, in its discretion, afforded greater weight to the two enhancement factors and very little weight to the one mitigating factor, which we conclude is not even applicable to Defendant's case. Therefore, we conclude the length of Defendant's sentence is justified based on the existence of the enhancement factors.

**Manner of Service**

Defendant also challenges the manner in which he was ordered to serve his sentence. The trial court sentenced Defendant, as a Range I standard offender, to serve the sentence in confinement in the Department of Correction. Defendant argues that he should have been granted full probation, or in the alternative, split confinement, an alternative sentencing option under Tenn. Code Ann. § 40-35-306 (1997), whereby a defendant serves a portion of his sentence, up to one year, in confinement and the remainder on probation. The State contends that the record supports the trial court's judgment in denying probation or any other form of alternative sentencing.

A defendant is eligible for probation if the sentence received is eight years or less, subject to some statutory exclusions. Tenn. Code Ann. § 40-35-303(a) (1997). An especially mitigated or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing. Tenn. Code Ann. § 40-35-102(6) (1997). Defendant was convicted of voluntary manslaughter, a Class C felony, and received an effective sentence of four years and six months. Accordingly, Defendant is entitled to the statutory presumption in favor of alternative sentencing. Where a defendant is entitled to the statutory presumption favoring alternative sentencing, the State has the burden of overcoming that presumption with evidence to the contrary. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991); *State v. Bingham*, 910 S.W.2d 448, 455 (Tenn. Crim. App. 1995), *overruled on other grounds*, *State v. Hooper*, 29 S.W.3d 1, 9-10 (Tenn. 2000); *see* Tenn. Code Ann. § 40-35-102(6), -103 (1997).

The determination of whether Defendant is entitled to an alternative sentence and whether he is entitled to full probation, however, are two separate inquiries, as they require different burdens of proof. *State v. Boggs*, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). Although Defendant, a Class C felony offender, is presumed to be a favorable candidate for alternative sentencing, he has the burden of establishing his suitability for full probation. *Bingham*, 910 S.W.2d at 455; *see* Tenn. Code Ann. § 40-35-303(b) (1997). To satisfy that burden, Defendant must show that probation will "subserve the ends of justice and the best interest of both the public and the defendant." *Bingham*, 910 S.W.2d at 456 (quoting *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990) *overruled on other grounds*, *State v. Hooper*, 29 S.W.3d 1, 8 (Tenn. 2000)). Although probation must automatically be considered by the trial court, "the defendant is not automatically entitled to probation as a matter of law." Tenn. Code Ann. 40-35-303(b) (1997), Sentencing Commission Comments; *State v. Hartley*, 818 S.W.2d 370, 373 (Tenn. Crim. App. 1991).

In determining whether to grant or deny probation, the trial court must consider the nature and circumstances of the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interests of the defendant and the public. *State v. Boyd*, 925 S.W.2d 237, 244 (Tenn. Crim. App. 1995). The court should also examine the defendant's potential for rehabilitation or lack thereof when considering whether alternative sentencing is appropriate. Tenn. Code Ann. § 40-35-103(5) (1997). Sentencing issues must be decided in light of the unique facts and circumstances of each case. *State v. Taylor*, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987).

Reasons for the trial court's denial of probation included Defendant's history of gun misuse and alcohol abuse and that incarceration would provide an effective deterrent to others in the small community. Furthermore, the trial court found that Defendant's lack of consistent employment and failure to pay child support, and his failure to assume responsibility for the offense and lack of candor at his trial and sentencing hearing weighed against granting probation.

The trial court found that Defendant lacked candor at trial and at the sentencing hearing. The defendant's lack of credibility may appropriately be considered as it reflects on a defendant's potential for rehabilitation. *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. 1997). Although Defendant did not testify at trial, the trial court emphasized his failure to assume responsibility for the victim's death. Defendant did not testify at the sentencing hearing either, but the trial court referred to a petition presented by Defendant at the sentencing hearing, which bears the signatures of 133 people and argues that Defendant is "a quiet, hardworking person who lives by himself on the family farm. He maintains the farm as well as pursuing his normal occupation as a licensed welder." In rebuttal, the State presented proof that Defendant's union membership was going to lapse for failure to pay dues and that he had not worked since the spring of 1998, and the union had since restricted him from working. At the sentencing hearing, the court heard from two witnesses who testified that they signed the petition, but did not know Defendant personally and could not attest to the representations made by Defendant in the petition. The witnesses knew Defendant's mother, who had circulated the petition for signing.

We conclude that the State submitted sufficient evidence to overcome the favorable presumption regarding alternative sentencing. Furthermore, Defendant failed to establish his suitability for full probation. Lack of truthfulness is probative on the issue of amenability to rehabilitation and is, therefore, an appropriate factor to consider in granting or denying probation. *State v. Neely*, 678 S.W.2d 48, 49 (Tenn. 1984). A lack of repentance and remorse is also an appropriate factor to consider. *See State v. Pierson*, 678 S.W.2d 905 (Tenn. 1984). Although the trial court expressed a concern for deterrence, no specific proof was presented as to the need for deterrence, and our supreme court has held that such evidence is necessary in order to deny probation on that basis alone. *State v. Hooper*, 29 S.W.3d 1, 13 (Tenn. 2000). We share the trial court's belief that in Defendant's case, confinement is necessary to avoid depreciating the seriousness of the offense. Tenn. Code Ann. § 40-35-103(1)(B) (1997). These are all factors that provide a sufficient basis upon which to deny probation.

The trial court placed the greatest significance on the proof presented at the sentencing hearing of Defendant's history of "mixing guns with alcohol." In making its determination, the trial court stated, "we've got to do something in [Defendant]'s case to break this chain or this way that he lives his life, of drinking constantly and using firearms constantly or displaying and mishandling them constantly." We agree with the trial court's determination that these circumstances make any probation an inappropriate sentence in this case.

## CONCLUSION

After a careful review of the record, we affirm the judgment of the trial court.

                _____
                THOMAS T. WOODALL, JUDGE