IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 20, 2004

## STATE OF TENNESSEE  v.  KENNETH H. LAWS

**Direct Appeal from the Criminal Court for Washington County
No. 27053     Robert E. Cupp, Judge**

_____

**No. E2003-01463-CCA-R3-CD
June 11, 2004**
_____

Defendant, Kenneth H. Laws, was indicted by the Washington County Grand Jury for aggravated assault, a Class C felony, and false imprisonment, a Class A misdemeanor. Following a jury trial, Defendant was convicted of aggravated assault and acquitted of false imprisonment. Defendant was sentenced to serve ten years in confinement. Defendant appeals, arguing that the evidence is insufficient to support his conviction and that his sentence is excessive. After reviewing the record before us, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID H. WELLES and JOE G. RILEY, JJ., joined.

David L. Leonard, Greeneville, Tennessee, for the appellant, Kenneth H. Laws.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Joe C. Crumley, Jr., District Attorney General; and Dennis Brooks, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

Sherry Reed, the victim, testified that Defendant was her "party buddy." On Thursday, June 28, 2001, she and Defendant purchased some alcohol and went to Defendant's Winnebago, where he lived. There they drank several bottles of "Mad Dog" and at least one case of beer. Defendant questioned Ms. Reed about whether she had slept with some friends whom she had visited the prior weekend. When Ms. Reed denied having slept with them, Defendant "grabbed" her face and told her not to lie. Inside the Winnebago, Defendant hit Ms. Reed with both fists "all over [her] head." Ms. Reed testified that her head was bleeding, her eyes were swollen, and her jaw was broken. Defendant "got mad" about Ms. Reed having bled on the rug, and he "slammed" her in the shower and told her to get the blood off of her. Defendant also told her to take off the dress she was wearing because it was bloody. Sometime after dark, Defendant's sister arrived. Defendant ordered the

victim to "get down on [her] hands and knees and crawl around to the back of the Winnebago and stay there like the dog [she] was." Ms. Reed testified that Defendant was intoxicated. After Defendant's sister left, Defendant continued to beat Ms. Reed inside the motor home. Ms. Reed testified that she "got [Defendant] to lay down but he was so mad he couldn't sleep, and [she] was hurting so bad [that she] couldn't lay [her] head down." Ms. Reed told Defendant that she was thirsty, and Defendant slung open the refrigerator and threw full beers at her. She testified that she was too afraid to call for help.

On the following morning, Friday, Ms. Reed told Defendant that she felt like she had been choking all night. Defendant said, "Yeah, I thought you were going mad or something, foaming at the mouth." Defendant did not seek medical attention for Ms. Reed. That morning, Ms. Reed's sister Linda Chase arrived. She offered to take Ms. Reed to the hospital, and Defendant objected, saying, "If she goes to the emergency room, what's going to happen to Kenny? What do you think will happen to Kenny?" (referring to himself). Ms. Reed was afraid that if she agreed to go to the hospital, Defendant would also hurt her sister. Ms. Reed's friend Connie Chase arrived, and Ms. Reed was also afraid to ask her for help. Defendant did not leave Ms. Reed's presence while the other two women were there. At some point, Defendant put a "keep out" sign at the entrance to the driveway leading to his motor home. Ms. Reed testified that Defendant kept his cell phone with him, and there was not another telephone inside the motor home. Defendant and Ms. Reed drank more alcohol that day. Ms. Reed testified that she drank slowly and she could not eat because her upper and lower jaw did not meet properly.

Ms. Reed testified that Defendant later took her to a motel. Ms. Reed checked into and paid for the motel room. Ms. Reed told the person in the office of the motel that she had been in a wreck. Inside the motel room, Ms. Reed got into the bathtub to wash blood out of her hair. While they were at the motel, Defendant talked to Connie Chase using Defendant's cell phone. Ms. Chase later arrived at the motel room and helped Ms. Reed clean herself. Ms. Reed testified that Ms. Chase was intoxicated when she arrived at the motel. She also testified that when Ms. Chase is intoxicated, she gets "obnoxious" and "loud." Defendant and Ms. Chase argued, and Defendant pushed her onto the bed and began hitting her. Ms. Reed told Defendant to stop, and Ms. Chase left the motel. Defendant took Ms. Reed back to the motor home. Shortly thereafter, Defendant took her to a house belonging to a man named A. Morrow, where they drank wine. Defendant then took Ms. Reed back to the motor home.

Ms. Reed testified that on Saturday, several people visited the motor home, but she did not know their names. She told the visitors that she "wanted help, but [she] was afraid to get it." Defendant and Ms. Reed "went on up to the front of the farm," where a group of people were drinking beer.

On the next day, Sunday, Ms. Reed's swelling and pain had increased. Ms. Reed testified that Defendant was sick in bed, and she watched television that day. She testified that Billy Carter arrived and sat with her for a couple of hours. After Mr. Carter left, Ms. Reed asked Defendant if she could drive his car to the store to buy soup, and he agreed. Ms. Reed drove Defendant's car to

Johnny's Market, where she called her sister Linda. She met her sister at Ingles grocery store, and her sister drove her to her house.

On July 2, 2001, Ms. Reed went to Johnson City Medical Center. Ms. Reed underwent surgery for a broken jaw. Her mouth was wired shut, and she was unable to eat solid food for forty days. Ms. Reed gave a handwritten statement to Detective Remine following the incident. Ms. Reed testified that she did not believe that she was free to leave Defendant's motor home.

Linda Chase, the victim's sister, testified that Defendant and the victim had lived together in the past. She visited the victim at Defendant's motor home, and saw the victim's injuries. The victim would not agree to go to the hospital. Ms. Chase stayed for about thirty minutes. When Ms. Chase left, Defendant told her that if she called the police, he would kill the victim. Ms. Chase spoke to the victim on the telephone, and the victim told her that she would leave whenever she had an opportunity to leave. The victim called Ms. Chase from Ingles on Sunday, July 1, 2001. Ms. Chase drove to pick her up. On cross-examination, Ms. Chase testified that Defendant did not seem upset by her presence and that he did not threaten her. Defendant said, "If she goes to the hospital, what's going to happen to Kenny?"

The parties stipulated that Dr. Michael Hamlin, an oral surgeon, examined the victim. Dr. Hamlin's examination revealed that the victim had a compound fracture of both sides of her mandible with bruising and tenderness on both sides of her jaw. The victim's injuries prevented her from eating solid foods. On July 5, 2001, Dr. Hamlin performed surgery on the victim.

Connie Chase testified that when she arrived at Defendant's motor home, the door was open and she went inside. She saw Defendant, the victim, and the victim's sister Linda sitting inside. Ms. Chase testified that when she entered the motor home, the victim was behind a partition. When Ms. Chase saw the victim, her "head looked like a basketball." She offered to take the victim to the hospital, and the victim told her that her sister would take her. Then, Ms. Chase left. Later that day, the victim called Ms. Chase and asked her to meet her at a motel. Ms. Chase knocked on the door when she arrived, and Defendant let her in. Ms. Chase put a bandage on the victim's head. Ms. Chase stayed at the motel room for about one hour. She testified that she and Defendant were "yah-yahing," and Defendant shoved her and she fell onto the bed. Ms. Chase had been drinking alcohol before she arrived at the motel, and she testified that she was intoxicated.

Investigator Tom Remine, of the Washington County Sheriff's Department, testified that on Monday, July 2, 2001, he took a statement from Ms. Reed at the hospital. Ms. Reed admitted that she was "very intoxicated" when the incident occurred. Ms. Reed stated that she did not leave the motor home out of fear that Defendant would beat her again. She stated that she left the motor home in Defendant's car while Defendant was sleeping on the morning of July 2, 2001. Investigator Remine also met with Defendant at the Detention Center. Defendant admitted that he was with Ms. Reed during the time period preceding Ms. Reed's hospitalization. After advising Defendant of his *Miranda* rights, Investigator Remine took the following statement from Defendant:

My girlfriend, Sherry Reed, has been living with me for the last two weeks. I believe it was Tuesday or Wednesday, 6/26 or 6/27, me and her was drinking Mad Dog 20-20 and we were both drunk. It was just me and her. This woman, I love her, but she can drink a case or two of beer a day. She's on pills, dope, you name it. We argued. Everybody that comes to my house, she likes to f- - - with. She's a bitch. We had a fight, just the same old s- - -, nothing like this here. She didn't look anything like that that night [referring to photographs taken of Ms. Reed in the hospital]. She told the woman at 11-E Motel that she had been in a wreck – that she had a wreck in a mobile home that ran off a mountain. I don't have any idea why she would have said that. She could have left at any time she wanted to.

Billy Carter testified for the Defendant. Mr. Carter visited Defendant's motor home on or about July 1, 2001. He testified that when he arrived, shortly after dark, Defendant was lying on the bed, and Ms. Reed was sitting at the table, watching television. The only light was from the television, and Mr. Carter did not observe Ms. Reed's injuries. Mr. Carter also testified that Ms. Reed did not complain to him about her injuries.

Patricia Lane, Defendant's sister, testified that she visited Defendant's motor home at around 9:00 p.m. on June 28, 2001. Ms. Lane testified that when she arrived, she saw Ms. Reed and two other women "scuffling" in the yard. Ms. Lane testified that she was about forty feet away from the women. Ms. Lane blew her car horn, and then she left. She did not see Defendant. Ms. Lane called Ms. Reed's son. Ms. Lane returned to the motor home on the following morning. When she arrived, Defendant and Ms. Reed were sitting at the table inside the motor home. Ms. Reed was "beat up," and Ms. Lane offered to take her to the emergency room, but Ms. Reed refused to go.

Michael Thomas testified that he went to Defendant's motor home on the afternoon of July 1, 2001, to collect payment for two boxes of floor tiles, which he purchased to install in Defendant's kitchen. When he arrived, Mr. Thomas knocked on the door, and Ms. Reed answered the door. Mr. Thomas noticed that Ms. Reed's face was bruised, and she had two black eyes. He asked Ms. Reed about her injuries, and she responded that she had been in a motorcycle accident several days prior. Mr. Thomas testified that Defendant was in bed asleep. Ms. Reed paid Mr. Thomas for the tile.

Brenda Laws, Defendant's cousin, testified that she visited Defendant's motor home in the late afternoon hours of June 28, 2001. Ms. Laws testified that there were twelve to fifteen people there, and "there was a party going on." Defendant was not there when Ms. Laws arrived. Ms. Laws testified that Ms. Reed was intoxicated. Ms. Reed got on Defendant's motorcycle and attempted to start it. Ms. Reed fell over and was trapped under the motorcycle. Defendant arrived and pulled the motorcycle off of Ms. Reed. Ms. Laws testified that Ms. Reed stood up and that she seemed "fine." Ms. Laws did not notice any injuries to Ms. Reed's face. Ms. Laws returned to Defendant's home around 2:00 or 3:00 a.m. Defendant was asleep. Defendant's car was not parked outside, and Ms. Laws did not see Ms. Reed. Defendant did not testify.

-4-

**Sufficiency of the Evidence**

When evaluating the sufficiency of the evidence, we must determine whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Keough*, 18 S.W.3d 175, 180-81 (Tenn. 2000) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979)). This Court must afford the prosecution the strongest legitimate view of the evidence in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Keough*, 18 S.W.3d at 181 (citing *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). Questions regarding the credibility of the witnesses, the weight to be given the evidence, and any factual issues raised by the evidence are resolved by the trier of fact. *Bland*, 958 S.W.2d at 659. A guilty verdict removes the presumption of innocence and replaces it with one of guilt. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). On appeal, the defendant has the burden of proving that the evidence at trial was insufficient to convict. *Id*.

A person commits aggravated assault who intentionally, knowingly or recklessly causes serious bodily injury to another. Tenn. Code Ann. § 39-13-102(a)(1)(A). Viewed in a light most favorable to the State, the proof at trial showed that Defendant hit Ms. Reed with his fists all about her head and face, causing severe bruising, cuts, and a broken jaw. Ms. Reed testified that she felt such pain that it prevented her from eating and sleeping. This proof is sufficient to conclude beyond a reasonable doubt that Defendant committed aggravated assault.

Defendant argues that conflicting explanations for Ms. Reed's injuries were offered. Ms. Reed testified that she told an employee at the motel that she was injured in a car accident. Mr. Thomas testified that Ms. Reed told him that she had been in a motorcycle accident. Ms. Laws testified that she saw Ms. Lane engaged in a scuffle with two other women. Ms. Reed testified at trial that Defendant beat her and caused her injuries. Factual issues are resolved by the trier of fact, and the jury's verdict of guilt indicates that the jury accredited Ms. Reed's testimony at trial.

Defendant also argues that, by its verdict, the jury discredited Ms. Reed's testimony. The jury acquitted Defendant of the charge of false imprisonment. The offense of false imprisonment occurs when a person "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a). Ms. Reed testified at trial that she was afraid to leave the motor home. The jury might not have believed that portion of Ms. Reed's testimony, but believed her testimony about Defendant having caused her injuries. It is within the province of the jury to accredit certain testimony and discredit other testimony. *See State v. Keels*, 753 S.W.2d 140, 143 (Tenn. Crim. App. 1988).

**Sentencing**

Defendant argues that his sentence is excessive. A defendant's sentence is reviewed by the appellate courts *de novo* with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d); *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002). For this presumption to apply to the trial court's actions, there must be an affirmative showing in the

record that the trial court considered sentencing principles and all relevant facts and circumstances. *State v. Pettus*, 986 S.W.2d 540, 543-44 (Tenn. 1999). While determining or reviewing a sentence, the courts must consider: (1) the evidence received at trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence offered by the parties on the enhancement and mitigating factors; (6) any statement the defendant wishes to make in the defendant's behalf about sentencing; and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103(5), -210(b); *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991).

A defendant who challenges his or her sentence has the burden of proving the sentence imposed by the trial court is improper. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments; *Ashby*, 823 S.W.2d at 169. If the trial court has imposed a lawful sentence by following the statutory sentencing procedure, has given due consideration and proper weight to the factors and sentencing principles, and has made findings of fact adequately supported by the record, this Court may not modify the sentence even if it would have preferred a different result. *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). However, if the trial court does not comply with statutory sentencing provisions, our review of the sentence is *de novo* with no presumption the trial court's determinations were correct. *State v. Winfield*, 23 S.W.3d 279, 283 (Tenn. 2000).

Aggravated assault is a Class C felony, which carries a sentencing range for a Range II offender of six to ten years. Tenn. Code Ann. § 39-13-102(d)(1); Tenn. Code Ann. § 40-35-112(b)(3). The presumptive sentence is the minimum sentence in the range if there are no enhancement factors and no mitigating factors. Tenn. Code Ann. § 40-35-210(c). If such factors do exist, a trial court should enhance the minimum sentence within the range for enhancement factors and then reduce the sentence within the range for the mitigating factors. Tenn. Code Ann. § 40-35-210(e); *State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001). If there are enhancement factors, but no mitigating factors, a trial court may set the sentence above the minimum within the range. Tenn. Code Ann. § 40-35-210(d); *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002). The statutes prescribe no particular weight for an enhancement or mitigating factor, and the weight given to each factor is left to the discretion of the trial court, provided the trial court has complied with the purposes and principles of the Sentencing Act and its findings are supported by the record. *State v. Gosnell*, 62 S.W.3d 740, 750 (Tenn. Crim. App. 2001); *State v. Zonge*, 973 S.W.2d 250, 259 (Tenn. Crim. App. 1997).

At the sentencing hearing, the State introduced into evidence a videotape that shows Defendant with some of his friends singing a song in which the lyrics describe beating a woman. Defendant testified at the sentencing hearing that his wife, who was seeking a divorce from him at the time of sentencing, had "always wanted [him] to make her a tape." Defendant testified that his wife "is doing everything she can to have [him] sent out." Defendant, his wife, and "a couple of buddies" had been drinking alcohol on the night that the videotape was made. Referring to the song in the videotape, Defendant testified as follows:

I've got an old song that I've always sung, you know, about messing with Kenny Laws (referring to himself), she broke my heart and I broke her jaw. And it's been – I've been singing the song for twenty years. And, you know – and I don't remember singing it that night, but, I have. It's been – I've sung it for thirty years. She broke my heart and I broke – and I always asked them have you ever heard that song she broke my heart and I broke her jaw while we'll be watching movies. Did you ever watch that movie she broke my heart and I broke . . . It's just something that I've always said.

The presentence report indicates that Defendant has an extensive criminal history. Defendant was sixty-three years old at the time of sentencing. Defendant admitted to having a prior criminal history. Defendant also denied guilt of the offense. Defendant testified that he rejected a plea offer by the State prior to trial because he was not guilty of the offense. About the incident, Defendant testified as follows:

I didn't know that the woman was even hurt. I know she was out there trying to start the motorcycle the night before, and she did fall twice and bust her face. There is proof of that. Otherwise, I didn't think she was hurt. She didn't ask to go to a doctor or nothing. I didn't think there was anything wrong with her. We'd all been down there a couple – two or – a week, a couple of weeks drinking and carrying on.

At the conclusion of the sentencing hearing, the trial court sentenced Defendant as a Range II offender to serve ten years in confinement, the maximum sentence within the range. In determining Defendant's sentence, the trial court emphasized that Defendant has a previous history of criminal behavior in addition to those necessary to establish the appropriate range. *See* Tenn. Code Ann. § 40-35-114(2). The trial court also applied enhancement factor (7), finding that "the injuries inflicted upon [the victim were] particularly great," but the trial court stated, "I'm not going to put a lot of emphasis on that one." *See* Tenn. Code Ann. § 40-35-114(7). The trial court placed emphasis, however, on enhancement factor (9), that Defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community. *See* Tenn. Code Ann. § 40-35-114(9). The trial court did not apply any mitigating factors, and Defendant does not raise any in this appeal.

Defendant argues that the trial court improperly considered non-statutory enhancement factors to enhance the length of his sentence. The trial court observed that Defendant showed a lack of remorse and a lack of potential for rehabilitation. However, the proper application of two statutory enhancement factors and the weight afforded them by the trial court justifies the sentence imposed.

The trial court declined to consider a community corrections sentence because Defendant was convicted for a crime of violence. *See* Tenn. Code Ann. § 40-36-106. In ordering Defendant to serve his sentence in confinement, the trial court also considered the following statutory factors,

which are also supported by the record: (1) confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct; and (2) confinement is necessary to avoid depreciating the seriousness of this offense. Tenn. Code Ann. § 40-35-103(1); *see also State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

We conclude that the trial court adequately stated its reasons for imposing the maximum sentence within the range, and the record supports the trial court's application of enhancement factors, and the trial court's order of incarceration is appropriate.

## CONCLUSION

The judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, JUDGE