IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 15, 2003 Session

## STATE OF TENNESSEE v. CHARLES WADE SMITH, III

**Direct Appeal from the Criminal Court for Perry County**
**No. 585     Donald P. Harris, Judge**

---

**No. M2001-01740-CCA-R3-CD - Filed September 11, 2003**

---

The defendant, Charles Wade Smith, III, was convicted by a Perry County jury of second degree murder for the shooting death of his father. The trial court sentenced the defendant as a violent offender to seventeen years of incarceration. The defendant now appeals contending that: (1) he was deprived of the opportunity to present exculpatory evidence; (2) the trial court erred in not giving a jury instruction regarding the relevance of the Defendant's intoxication to negate his culpable mental state; and (3) the evidence presented is insufficient to support his conviction. Finding no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

Lloyd R. Tatum, Henderson, Tennessee (on appeal); and Ricky L. Wood, Parsons, Tennessee (at trial), for the appellant, Charles Wade Smith, III.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Kim R. Helper, Assistant Attorney General; Ronald L. Davis, District Attorney General; and Jeffrey L. Long, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts and Procedural History

The Defendant, Charles Wade Smith, III, was indicted by a Perry County Grand Jury on one count of violating Tennessee Code Annotated section 39-13-210, Second Degree Murder, a class A felony. The defendant pled not guilty and, after a jury trial, was convicted of the crime charged. The following proof was presented at the Defendant's trial.

Perry County Sheriff's Department Dispatcher Patsy Lemay was on duty on May 19, 1998, when she received a call around 1:00 a.m. from someone who identified himself as Mr. Charles Wade Smith. She testified that the caller told her, "I've just shot my father." Lemay asked the caller his name again and he said, "Charles Wade Smith, and I'm on Spring Creek and

I need an ambulance. I have just shot my dad. He was trying to kill me with a nine millimeter, and I shot him with a shotgun." Lemay asked the Defendant if the victim was dead and he said, "He's dying now."

The sheriff, Thomas Ward, who was in the office when the call came in, took the telephone and talked to the Defendant. Thereafter, he and Deputy Sheriff Harold Mercer left for the scene. Lemay stated that the sheriff contacted her to inform her that he and the deputy had arrived at the scene, and he directed her to contact the Tennessee Bureau of Investigation. According to the log books, Deputy Mercer first transported the Defendant to Baptist-Perry Hospital for tests and then to the jail.

Deputy Mercer testified that when he and the sheriff arrived at the crime scene, the Defendant was inside the house, talking on the phone. Following the sheriff's instructions, the Defendant put down the phone and came out of the house. Deputy Mercer checked the Defendant for weapons and put him in the patrol car. Deputy Mercer testified that when he and the sheriff arrived at the scene, the Defendant told him the Defendant shot the victim after the victim threatened to shoot him with a pistol.

Deputy Mercer and the sheriff went into the house and found the victim laying on his back on the livingroom floor, with what appeared to be a shotgun wound to the chest. The victim had no pulse and did not appear to be breathing. The ambulance team arrived shortly after the officers and confirmed that the victim lacked a pulse. Deputy Mercer testified that the victim "had a pistol laying in his hand," but that "the pistol was upside-down" and it looked more like "the gun [was] laid back in [the victim's] hand than [like] somebody . . . holding it like they want[ed] to shoot it." He also testified that there was a shotgun near the victim's body.

Deputy Mercer testified that when he and Agent Armour were working at the crime scene Agent Armour picked up the gun found in the victim's hand and determined that it was a nine millimeter pistol. The pistol was loaded with eleven shells in the clip and one in the barrel, leaving room for one more shell in the clip. Deputy Mercer testified that the hammer on this model pistol must be cocked in order shoot the pistol, and the hammer on the pistol found in the victim's hand was "down," indicating it was not ready to shoot. In addition to the pistol, Deputy Mercer found a deer rifle inside the house and a .22 rifle, which appeared broken, on the ground near a pickup truck parked at the rear of the house.

Deputy Mercer testified that the sheriff stayed on the scene while Mercer took the Defendant to the hospital and then to the jail. At the hospital, Deputy Mercer ordered that blood and urine tests be performed on the Defendant, "because there had been a killing." After taking the Defendant to the hospital, Deputy Mercer took the Defendant to the jail. At the jail, Mercer met Tennessee Bureau of Investigation Special Agent Dale Armour, and the two then returned to the scene, where they arrived at about 3:00 a.m. and worked until 6:00 or 7:00 that morning. Deputy Mercer testified that after "working" the scene they returned to the jail, and Agent Armour interviewed the Defendant with Deputy Mercer present.

Deputy Mercer testified that the Defendant told him that he and the victim got into an argument over lighting a grill to cook some food and that the victim had a pistol and was threatening to shoot him. In response, the Defendant went into the living room, walked by the victim, who was sitting in a chair, and got a .22 rifle out of a closet. The Defendant then walked back by the victim, with the gun down to his side, went outside and around behind the house. The Defendant told Deputy Mercer that the victim came out on the deck and fired around the corner of the house at him while he was near the pickup truck. The Defendant then shot back at the victim from near the truck. Deputy Mercer examined the area and opined that the events were not likely to have taken place as the Defendant described.

Deputy Mercer testified he checked the deck, around the edge of the deck, in the house, and behind the pickup truck for spent shell hulls. The officers found two shotgun shell hulls on the deck where the Defendant said that he was when he shot the victim. Deputy Mercer opined that one was used when the Defendant shot into the air and that the other that was used when the Defendant shot at and killed the victim. Other pistol hulls were found on the deck, but none were from a nine millimeter gun. The only nine millimeter shells found were in a partially-used box located in a night stand about ten to twelve feet from the body. Additionally, Deputy Mercer testified that the officers had walked around the property looking for more pistol shell hulls, but did not find any. The deputy admitted that the grass was "pretty long" and the officers did not actually get out in the grass area looking for shell hulls. Neighbors told Deputy Mercer that the Smith family, of which the victim and the Defendant were a part, often sat on the porch and fired weapons toward the large field area in the front of the house.

On cross-examination, Deputy Mercer testified that he knew the victim in this case and knew that the victim had "quite a bit of a drinking problem." He also stated that some of the victim's neighbors said, "they do a lot of shooting up there around his house . . . maybe a lot of target practice or something . . . ." However, Deputy Mercer never "dealt with the victim on any charges with a gun." During the course of his investigation, Deputy Mercer interviewed the victim's ex-wife who said that, when they were married, the victim was very abusive to her when he had been drinking.

Special Agent Dale Armour of the Tennessee Bureau of Investigation testified that at the time of this shooting he was a field agent working criminal cases. He stated that he was assigned to investigate this shooting and met Deputy Mercer at the sheriff's department before going with him to the crime scene. Agent Armour described the victim's body as he first saw it, with a gunshot wound to the right chest, the pistol's position in the victim's hand, and blood in the palm of the victim's hand holding the gun. He also testified that he examined the weapon in the victim's hand and identified it as a Browning semi-automatic, nine millimeter clone. Upon examining the gun, the agent determined that it was loaded and could have held one more round. Further, he testified that the hammer was down, which was not in firing position for that weapon.

Agent Armour testified that he interviewed the Defendant about eight o'clock the next morning at the sheriff's department. He advised the Defendant of his right to counsel, and the Defendant waived that right. Agent Armour testified that the Defendant first gave a verbal statement and then a written statement. The written statement included the following:

On Monday, May 18th, 1998, [the victim] and me went riding around visiting people. We cashed my unemployment check and I bought beer to take back to his house. We arrived back at his house about 11:00 p.m. We had both been drinking.

I wanted something to eat. I went out the side door and attempted to start the grill. I asked [the victim] for a light and he went crazy. He said he would not give me a light and it went downhill from there. We exchanged words, we called each other son of a bitch and other things. [The victim] said he was going to kill me. [The victim] has threatened me with a gun before. At this time I went to the closet under the steps of the bathroom and I got a .22 automatic rifle. I held the rifle down by my leg and ran out of the house.

[The victim] was sitting in his chair between the bed and the stairs. He was not sitting in the recliner. I did not see the pistol when I ran out. [The victim] went onto the deck and fired two or three rounds towards the truck where I was. I fired back towards him with the rifle. He went into the house. I waited about fifteen minutes for him to cool off. The rifle I had, the .22, broke. The cylinder magazine tube came off the gun and then the stock came off.

I waited about fifteen minutes and then I remembered there was a loaded .12 gauge in the truck. I shot the gun in the air, then I pumped it. I knew it was loaded. I went to the side door and [The victim] was walking around. I told him, 'I just wanted to started the grill. I wanted something to eat.' And he said, 'I'm going to kill you, you son of a bitch.'

I went alongside the deck to the sliding glass door. [The victim] said, 'Don't stick your head around here.' I saw him coming at me with the nine millimeter. I was still on the deck. I put the shotgun to my shoulder and leaned around the corner. I shot in, he was about ten feet away from me. I fired the shotgun only once. I racked a round into the gun. He was down. He fell straight back towards the blue recliner. He was lying on his back and I heard gurgling noises coming from him.

I set the shotgun down either by the bed or on the porch. I called 911, then my mother, and then I called my ex-wife . . . . He never moved again. I'm not sure, but the gun, shotgun, had not been fired since I moved in two months ago. I was still talking to my ex-wife when the cops got there. I never touched him or the pistol after I shot him. I held the shotgun on [the victim] while I called 911. He never moved, turned over or wiggled. He just gurgled. The handgun, the nine millimeter, is in his hand, it never fell out.

Agent Armour testified about multiple facts that he found implausible in the Defendant's statement. The agent opined that it was "strange" that the Defendant walked within inches of the victim both to get the gun and to go back outside. Further, Agent Armour questioned why, when the Defendant was waiting in the back of the house, did he not just leave the area. In response,

the Defendant said that he "didn't want to do that." The agent was also skeptical about the portion of the Defendant's statement regarding the victim firing at the Defendant. Agent Armour opined that for the events to have occurred as the Defendant said, the victim would have had to lean over the outside deck railing to fire at the Defendant. Finally, the agent thought it odd that a person could be shot with a shotgun and still have a pistol in his hand.

Agent Armour testified that he searched the deck where the Defendant said the victim was standing when the victim shot at the Defendant and found the two shotgun shell hulls from the Defendant's gun and several other pistol shell hull. The pistol shell hulls were from many different caliber guns, but none were "fresh brass," leading him to believe that none were from the gun that the victim allegedly fired. Further, the agent noted that the multitude of shell hulls was consistent with the neighbors' descriptions that "the Smiths stood on the front deck and fired a lot of different guns off." Agent Armour also searched near the truck, where the Defendant said he was when he shot at the victim, but did not find any "fresh brass" there either.

Agent Armour testified that he interviewed the Defendant again, after the Defendant signed the first statement. In this second interview, the Defendant said that the first time he fired the shotgun into the air he was on the deck and not by the truck, as he said in his first statement. The agent noted that this testimony explained the extra shell hull found on the deck. The agent testified that the Defendant demonstrated his actions leading up to the shooting of the victim. The Defendant showed him how he shot the first time from outside the doorway, and then how he stood behind the wall, mounted the shotgun to his shoulder and rolled around the corner, shooting from outside the door. Agent Armour opined that the only reason to shoot the first shot into the air from right outside the door was to "draw [the Defendant's] father out," however the Defendant never provided a motive for firing the first shot.

Agent Armour read into evidence the following statement given by the Defendant during the second interview:

> I was not telling you the truth about the nine millimeter not being moved. After I shot [the victim] the gun fell from his hand. I took a blue-colored washcloth and picked up the pistol and I put the nine millimeter pistol in his hand. I also shot the shotgun on the deck by the sliding door into the air, not at the truck. I then racked the gun and reloaded it.
>
> This was when [the victim] told me that he was going to kill me if I stuck my head around the corner. I put the shotgun to my shoulder, leaned around and leaned around the corner. I fired and he went down. I s[at] on the porch and collected my thoughts. [The victim] was gurgling. I then went inside and called 911 and my mom and ex-wife.

Agent Armour testified that there was blood covering the victim's wrists and palm, which indicated that the victim touched his wound. Agent Armour testified that there was little blood on the pistol found in the victim's hand, considering the amount of blood on the floor and

on the victim. Armour stated that he had smelled the gun at the crime scene, and it did not smell as though it was recently fired.

Agent Armour testified that he examined victim's body at the crime scene and found a blood trail to the side of the victim in the carpet. The blood trail ran down the victim's arm, as though the victim had been lying on his side. Additionally, there were four bloody fingerprints on the victim's left leg. The agent thought this was unusual because the Defendant said the victim fell and never moved. Agent Armour stated that while inspecting the area around the victim, he found no ammunition other than the box Deputy Mercer brought to his attention. The agent found no nine millimeter hulls inside the house. Further, Agent Armour testified that did not find any bullet holes in the exterior of the house where the Defendant said the victim was standing when the Defendant first shot at him from near the pickup truck. The agent testified that, while part of the front of the pickup truck was visible from where the Defendant said the victim was standing, a right-handed person would have to lean out from the house in order to have the truck in his line of sight to shoot a weapon.

On cross-examination, Agent Armour testified that tests of the nine millimeter pistol found in the victim's hand showed that it was in "good working condition with the safety feature functioning." The agent also testified that he did not take any blood samples or fingerprints from the crime scene. The agent explained that since the Defendant admitted at the scene that he shot the victim and since both the Defendant and the victim lived in the house, both their prints would have been expected. However, he did take evidence from the victim's hands for a gun residue test, which is designed "to find out if someone had fired a weapon or not," but is not "one hundred percent reliable." The agent confirmed that the TBI received a written request to perform the gunshot reside test, but could not explain why it was never performed.

Sheriff Thomas Ward testified that he was in the office at the jail around one o'clock in the morning on May 19, 1998, when the call came in from the Defendant. He heard the Defendant tell the dispatcher that he killed the victim. The sheriff then spoke with the Defendant, who told him also that he killed the victim after the victim tried to kill him. When speaking with the Defendant, the sheriff heard a gurgling noise in the background and upon inquiring what the noise was the Defendant told him that it was the victim. The sheriff told the Defendant that he would be coming to the crime scene and told the Defendant to meet him out in the yard without a gun. The Defendant requested an ambulance, and the sheriff told the Defendant that he would send one.

Sheriff Ward testified that he and Deputy Mercer then left the jail and went to the crime scene. When the sheriff arrived, the Defendant was not outside, and the only vehicle at the house was the victim's truck. Sheriff Ward testified that it was dark behind the house and that he "sat down at the back wall, because there was a truck parked there and a rifle leaning up against . . . it." After a minute or so, the sheriff heard somebody in the back part of the house, so he looked in the window and he saw the Defendant standing inside, drinking a bottle of beer and looking at the victim. The sheriff testified that he "pecked on" the window and motioned for the Defendant to come outside. The Defendant came outside, sat down on the steps and finished

drinking the beer while he told the officers what happened. The sheriff said that the Defendant cooperated with the officers, but that he later learned that the Defendant was not completely truthful with them. It appeared to the sheriff that the Defendant had been drinking quite a bit, but that he appeared calm.

The sheriff testified that he proceeded into the house to check the victim and found him dead. When he went inside the house, the sheriff saw other guns "sitting around" and noticed bullet holes inside the house. The sheriff testified that he came back outside and testified that "[the Defendant, the sheriff and the deputy] just stood there and talked for a few minutes." Sheriff Ward testified that, thereafter, he told the deputy to take the Defendant to the hospital "get him checked and get a blood test and then take him on to the jail." The sheriff then called the dispatcher to have the TBI sent to the crime scene, and he waited there until the TBI agent arrived. After the TBI agent arrived, the sheriff turned over the investigation to him.

On cross-examination, Sheriff Ward stated that he had known the victim for ten to twelve years because of the victim's "association with drinking." Further, he testified that, since he became sheriff, his office had received several calls about the victim concerning drinking, shooting guns and violence against the victim's son and other people. The sheriff opined that the victim had a reputation for "pulling guns" on people. He also believed it possible that the victim would have "pulled a gun" on his son.

Sheriff Ward testified that he had investigated and referred to the TBI another possible homicide that was reported at the victim's house six or seven years before the trial in the case under submission. In that investigation ("1993 Investigation"), the victim's stepson was killed with a firearm. The 1993 Investigation revealed that the victim and his stepson got into an argument after the victim had been drinking and that the stepson died of a bullet wound. The sheriff never considered the victim as a suspect in his stepson's killing. At the conclusion of the 1993 Investigation, both the sheriff and the TBI concluded that the stepson's death was a suicide, a conclusion with which the stepson's mother disagreed. Sheriff Ward estimated he has made calls to the victim's residence once or twice a year for shooting and fighting incidents involving people other than the Defendant. Sheriff Ward testified that he thought that he had also responded to calls to the victim's residence for "drunk driving."

The sheriff also testified about the terrain around the house. Sheriff Ward said that the closest neighbor was about three to four hundred yards away and could be seen from the house. Further, he stated that three or four other neighbors' houses could be seen from the back of the victim's house. The front of the house was an open field. Consequently, the sheriff opined that the Defendant "had a place to go that night, he could've left." However the sheriff admitted that he had previously said that the victim's house is "scary looking" and that you are "sort of trapped up there."

Emma Lavy testified that she lives near the victim's house and had known the victim since 1987. Lavy testified that on the night of the incident she was inside her home around nine o'clock when she heard some shooting. The shooting did not draw her attention because it was a usual sound. Later that evening, Lavy heard another shot around ten or ten thirty, which was

louder than the first shots. Lavy testified that the later shot sound like a "boom," which was different from the first shots, which made a "cracking sound." Lavy testified that it seemed like an hour or more after the "boom" that she heard ambulance sirens. When asked about the victim's relationship with the Defendant, Lavy testified that the victim told her that he was concerned for the Defendant and that she could tell that he cared for the Defendant.

Benny Daniel Holloway, another of the victim's neighbors, testified he had been around the victim and the Defendant enough to know about their relationship. Holloway stated, "I guess they hated each other . . . ." Holloway testified that he did not have any personal knowledge of the victim shooting at the Defendant but that "[the victim] shot all the time. It was almost an everyday occurrence . . . ." Holloway stated that, if the victim shot at something he "never did miss, he was too good of a shot." Holloway testified that he was home the night of this incident. He said that at thirteen minutes after 10:00, he and his wife heard a "big boom." Holloway also testified that he never saw the victim "pull a gun" on anybody. He stated that when he and the victim drank together, the victim "always had guns, but . . . never . . . pulled one on me." Holloway testified that the victim was overbearing and that if the victim "could run . . . over you, he would." He acknowledged that the victim used guns to intimidate people to the point that they would back down.

Dawn King, a toxicologist forensic scientist with the TBI for approximately five years, testified that she received the Defendant's blood sample from Agent Armour and the victim's blood sample from Dr. Harlan, who performed his autopsy. King testified that she performed blood alcohol testing on these two samples and found that the victim's blood alcohol level was .24% and that the Defendant's blood alcohol level was .19%. King testified that in Tennessee a person is presumed intoxicated if they have a blood alcohol level of .10%. King testified that alcohol levels like those found in the victim and Defendant could affect the body. She stated that "[a]t that level you could have altered gait, blurred vision, decrease in critical judgment, increase in reaction time, there could be a loss of inhibitions." She summed up by agreeing that "in common language . . . both of these people were intoxicated."

Robert Daniel Royse, a special agent forensic scientist with the TBI specializing in the area of firearms identification, testified that he examined the shotgun and the nine millimeter pistol connected with this case. He performed a function test on both guns and found that both were operational and would fire properly. Royse also tested the two twelve gauge shotgun shells to see if these shells were fired by the shotgun in this case. From these tests, Royse determined that the shells were fired from the shotgun Agent Armour submitted for testing.

Royse testified that he received a tee shirt and a pair of bib overalls from the victim upon which he performed microscopic tests to determine if any gun powder residue or lead residue was present on the clothing. Royse said he "found lead residues which are consistent with the passage of lead shot pellets [from a shotgun]." He also examined the shot pellet holes in the overalls and determined that their pattern was consistent with the victim being greater that nine feet and less than seventeen feet from the shotgun at the time it was fired at him.

On cross-examination, Royse was asked about gunshot residue testing of the victim's hands. Royse explained that such a test would indicate whether a person has either fired a gun, handled a gun, or was in close proximity to a firearm when it was discharged. Royse acknowledged that a gunshot residue kit was taken on the victim. Further, he testified that while another section of the laboratory was responsible for performing the test from the kit, it was his understanding that "one of the swabs on the left back, that's the back surface of the left hand, was missing from the kit, therefore, the kit was not able to be examined." Royse clarified that as a matter of standard operating procedure, the TBI does not utilize gunshot residue test kits on shooting victims because a shooting victim usually has either fired, handled or been in close proximity to a discharged weapon and would, therefore, test positive for gunshot residue.

The parties stipulated to the contents of the autopsy report prepared by Dr. Harlan. The State summarized the report as stating that "this fifty-one year old white male received a shotgun wound to the chest and abdomen producing injury to the heart, right lung, liver, bleeding and death. The blood alcohol level is point two four grams percent ethyl alcohol."

The Defendant, Charles Wade Smith III, testified in his own defense. He testified that at the time of trial he was thirty-two years old and currently resided with his mother, Pat McCommon. The Defendant testified that his mother was married to the victim, Charles Wade Smith, Jr., for about eight years, with the marriage ending in divorce. The Defendant testified that after the divorce he continued to live with his mother in Jackson, Tennessee, until about two months prior to the incident, when the victim gave him permission to move in with him.

The Defendant testified that he had a "pretty good" relationship with the victim as long as the victim was not drinking. The Defendant said the victim had a drinking problem and that, when the victim drank, his personality changed. The Defendant said, "any little thing could set him off, just really wasn't any reason for it, it's just – it's like turning a light switch, it's a completely different person."

The Defendant testified about the victim's use of firearms. The Defendant stated that the victim liked guns and kept a lot of them around the house. The Defendant stated that "if [the victim] was sitting in the house, he was no more than arm-lengths away from at least some kind of a gun." The Defendant testified that the victim kept a pistol "down beside his chair, right there in the cushion." The Defendant identified the pistol in evidence as the gun the victim kept near him at all times. The Defendant said that when the victim was drinking and started "pulling guns," the Defendant was scared of him and tried to get away.

Additionally, the Defendant said the victim "pulled a gun" on him several times. The Defendant testified that he had seen the victim "pull a gun" on others. The Defendant testified that the victim fired a gun at him on multiple occasions, and described in detail several such occasions. The Defendant testified that usually, after firing at the Defendant, the victim would cool down a little bit and then would be okay.

The Defendant testified that prior to the night of the shooting the victim never threatened to kill him, but had threatened to, and did, beat him. The Defendant testified that one night the

victim, who was much larger than he, threw him around the room, braking three of the Defendant's ribs. The Defendant testified that the victim also held a knife to his throat several times, but the Defendant would get away, and the victim would cool off. The Defendant described numerous acts of physical violence by the victim that were directed toward the Defendant and others, including the Defendant's mother. The Defendant also testified about a prior shooting that occurred at the victim's house that resulted in the death of the Defendant's stepbrother. Although the death of the Defendant's stepbrother was thought by the authorities to be a suicide, the Defendant suspected that his father actually shot and killed the Defendant's stepbrother.

Concerning the killing of the victim in this case, the Defendant testified about the events which led up to the shooting death of the victim. The Defendant testified that he and the victim went out in the afternoon and bought beer, which was paid for by the Defendant. Thereafter, the two visited the victim's friends and came home around 11:00 or 11:30 that night. The Defendant admitted that both he and the victim had been drinking while they were out and that he knew the victim was taking pain killers.

The Defendant said that after they arrived home, the Defendant was hungry and took some meat from the freezer to the grill outside, but he did not have a lighter to start the fire. The Defendant said when he asked the victim for a lighter, the victim said, "Screw you. You're not getting my lighter." The Defendant testified that he then went to use the bathroom and, as he walked past the victim sitting in his chair, the victim threatened to kill him. The Defendant said that he disregarded the threat because he knew the victim would make such threats when he was drinking. The Defendant said the victim said a second time, "I'm going to kill you." As the Defendant walked past the victim, he saw him "moving in his chair like he was going for his pistol." The Defendant said "the .22 rifle was sitting there and I put it down beside my leg and ran out of the house."

The Defendant stated that he went out the side door and went behind the house and then behind a tree. The Defendant testified that from behind the tree he could see the porch. The Defendant testified that by the time he got behind the tree, the victim was already firing shots at him. The Defendant said he fired a couple of shots back, but he only shot in that direction and did not aim to kill the victim. The Defendant testified that it was so dark that he could not see the victim, but could see the fire from his gun. He said he returned fire with the .22 until "the gun just fell apart."

The Defendant said that he then got into the truck to try to leave, but could not find the keys. He said " I didn't know what [the victim] was going to do. So I stood by the truck for a little bit and tried to regain my thoughts, and I remembered that there was a shotgun behind the seat of the truck." The Defendant said he waited out by the truck for at least five or ten minutes, and that the victim quit shooting, and the Defendant assumed he had gone back into the house. The Defendant testified that the shotgun in the truck was not his and he did not know if it was loaded. He testified that he grabbed the shotgun out of the truck and shot it once into the air to see if there was a shell in the chamber and, as it was the first time he used the gun, to determine how the gun operated. The Defendant testified that he then walked back to the porch and did not

see or hear the victim through the door. The Defendant said he proceeded to the front corner of the deck and still heard nothing from inside.

The Defendant testified that he was scared at this time, but wanted to find out what was bothering the victim. Thinking that the victim would have cooled off, the Defendant testified he came up to the sliding glass door, stuck his head around and asked the victim what his "damn problem was." The Defendant testified that the victim was standing in front of the blue recliner in the middle of the room, facing the corner of the door, and said he was going to kill the Defendant. The Defendant testified that the victim had the nine millimeter pistol in his hand. The Defendant then demonstrated how the victim walked toward him and started raising the gun toward the Defendant. The Defendant said the victim "looked pretty crazy," and, although the Defendant had seen the victim that mad before, the victim had never threatened the Defendant's life before. The Defendant testified that he honestly believed at that point that the victim was going to shoot him, and he felt it reasonable to defend himself.

The Defendant stated that right after he shot the victim he went inside, called 911 and told the officer that he just shot the victim and needed an ambulance. He testified that he then called his mother and told her what happened, and then called his ex-wife. The Defendant testified that he was on the phone with his ex-wife when the sheriff arrived. The Defendant admitted that prior to the police arriving, he picked up the pistol and put it in the victim's hand. He explained that when he shot the victim, he "kind of stumbled around and the gun flew out of his hand across the other side of the room . . . ." The Defendant said he picked up the pistol because he was scared and in shock. He admitted that the first time he talked to Agent Armour, he did not tell him about what he did with the pistol because "Well, he didn't really ask me anything about it or anything, and I -- I was scared and nervous and upset and hadn't had much sleep that night." The Defendant stated that when he gave Agent Armour his second statement, he told the agent he was untruthful the first time, and that he had picked up the pistol with a washrag and put the it in the victim's hand.

The Defendant admitted that when he came back to the house, he hid outside the house behind the sliding glass door. The Defendant testified that he did not mean to shoot the victim in the chest. He stated that he was not really aiming, he just pulled the trigger. The Defendant testified that he did not shoot the victim in an extremity because "[t]here wasn't too much time to think because [the victim] was trying to shoot me." The Defendant insisted he did not intend to kill the victim. However, the Defendant said that he was ten to fifteen feet away from the victim when he shot at him and that he knew that the destruction caused by a close range shotgun wound is "pretty bad."

The Defendant admitted he did not render any first aid or CPR after he shot the victim, but explained that he did not do so because he was unfamiliar with these emergency aid techniques. According to the Defendant's testimony, the victim fired the pistol at him multiple times. When asked about why the police found only one bullet missing from the pistol's chamber, the Defendant speculated that the victim reloaded his pistol while the Defendant was out at the truck. The Defendant testified that when he went back to the house to get his things

after the shooting he saw two nine millimeter shells laying next to the bed upstairs. The Defendant testified that the victim had time to reload the gun.

Ellis White testified that he and the victim were around each other a lot because they grew up on adjoining farms. White testified that the victim was a very abusive and violent person. White testified that he saw the victim abuse his wife in front of the Defendant on two occasions that he could recall.

Bill White testified that he is the victim's uncle and that the victim "could be pretty abusive. . . . He was single-minded, he was a big, stout fellow and he -- he could push his way around pretty much." Bill White admitted that he never saw any specific acts of violence by the victim in the Defendant's presence, but offered that he "was not around [the victim] that much, particularly after he and [the Defendant's] mother divorced . . . ."

Fran Peters testified that she is the sister of the Defendant's mother. She stated that she had lived with the Defendant and his mother for three years in Jackson, Tennessee, and was familiar with the victim because she was around him a lot in her "earlier years." Peters testified that "[h]e was very unpredictable, to the point I was very nervous around him." Asked if she had seen any specific acts of violence by the victim in front of his son, she said she had seen the victim verbally abuse the Defendant. Peters testified that on one occasion she observed the victim emerge from his garage with a gun in his hand after threatening to kill her sister.

Pat McCommon, the victim's ex-wife and the Defendant's mother, testified that she lives in Jackson, Tennessee, and was married to the Defendant for ten years. Concerning the victim's character for violence, McCommon testified that the victim was a very cruel and violent man. She said he was easily angered and that she often had to take her son and run out of the house. She testified that she would stay with friends during these times because the victim would threaten her to not go to her parents' home.

McCommon also testified that the victim "pulled a gun" on her many times. She stated that, although she tried to keep these acts of violence away from her son, she was not able to do so entirely. McCommon testified that when the Defendant was younger, the victim "would go off and drink and come in in the "wee hours" of the morning. And he would just walk in and just start something, run in there and pull a gun. I would take [the Defendant] and hide him." McCommon added that these kinds of acts of violence were continuous and, sometimes, if she thought he was about to be in a violent mood, she would take the Defendant to her parents' house or to a friend's house and leave him there.

McCommon testified that she received a telephone call from the Defendant around one o'clock on the day of the incident. She stated that the Defendant told her he "just shot [the victim]. . . . He pulled a gun on me, tried to kill me . . . and I shot him." She said she thought she remembered asking if the victim was still alive, then the Defendant started crying. McCommon stated that she told the Defendant to calm down and said she would be right there.

McCommon stated that she signed a statement to TBI Agent Armour. McCommon was asked to read the last paragraph into the record as follows: "This conversation lasted a brief moment. I did ask if the gun was still in [the victim's] hand. [The Defendant] said yes. I told him not to touch anything." When asked why she wanted to know if the gun was still in the victim's hand, McCommon stated that it was "for the simple fact that it would prove that [the victim] did pull a gun on [the Defendant], and if the gun wasn't there, it might be questionable . . . ." McCommon admitted that she now knows that the Defendant planted the gun in the victim's hand, but did not know until after she had given her statement.

The jury returned with a verdict of guilty to the charge of second degree murder and set a fine at twenty-five thousand dollars. The trial court sentenced the Defendant as a violent offender to serve one hundred percent of a seventeen-year sentence in the Tennessee Department of Correction. The Defendant now appeals his conviction to this court, contending that: (1) he was deprived of the opportunity to present exculpatory evidence; (2) the trial court erred in not giving a jury instruction regarding the relevance of the Defendant's intoxication to negate his culpable mental state; and (3) that the evidence presented is insufficient to support his conviction.

## II. Analysis

As stated above, the Defendant asserts that he is entitled to a new trial based upon two errors committed by the trial court. He also asserts that the evidence presented against him is insufficient to support his conviction. We address the sufficiency issue first, as it is potentially dispositive of this case.

### A.  Sufficiency of the Evidence

The Defendant contends that insufficient evidence was presented to support his conviction. When an accused challenges the sufficiency of the evidence, "the standard for review by an appellate court is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000) (quoting State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999)); See Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. Smith, 24 S.W.3d at 279; State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. Buggs, 995 S.W.2d at 105; Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest

legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

In the case under submission, the Defendant was found guilty of an offense pursuant to Tennessee Code Annotated section 39-13-210 (1997 & Supp. 2002). That code section states, in pertinent part that "Second degree murder is: (1) A knowing killing of another."

> "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result . . . .

Tenn. Code Ann. 39-13-106 (a)(20) (1997). The killing must also be unlawful. Tenn. Code Ann. § 39-13-201 (1997). This Court has determined that second degree murder is a "result of conduct offense." State v. Page, 81 S.W.3d 781, 788 (Tenn. Crim. App. 2002). Therefore, the evidence presented at trial must have been sufficient to prove beyond a reasonable doubt that the Defendant was aware that his conduct was reasonably certain to cause the death of the victim. Id.

The Defendant contends on appeal that the evidence required the jury to find that the Defendant killed the victim in self-defense.

> A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

Tenn. Code Ann. 39-11-611 (1997). Accordingly the three prerequisites that must be met before one is justified in killing another human being under the rubric of "self-defense" are: (1) the defendant must reasonably believe he is threatened with imminent loss of life or serious bodily injury; (2) the danger creating the belief must be real or honestly believed to be real at the time of the action; and (3) the belief must be founded on reasonable grounds. State v. Meade, 942 S.W.2d 561, 565 (Tenn. Crim. App. 1996). The issues of self-defense and degree of homicide are for the jury to decide in light of all of the circumstances of the killing. State v. Keels, 753 S.W.2d 140, 143 (Tenn. Crim. App. 1988) (quoting State v. Gilbert, 612 S.W.2d 188, 190 (Tenn. Crim. App. 1980)). In deciding these issues, the jury was free to believe the testimony of some

of the witnesses and not that of other witnesses, or they could believe a part of a witness' testimony and reject part of a witness' testimony. Id.

In the case under submission, the evidence is clearly sufficient to support the Defendant's second degree murder conviction. According to the Defendant's own testimony, the victim shot from the deck of the house while the Defendant was outside behind a truck. The Defendant testified that he then went back to the house, fired one shot in the air, and then inquired as to the victim's problem. The Defendant further testified that the victim raised his hand, with a pistol in his hand, and the Defendant shot the victim. However, the Defendant also testified that the pistol fell out of the victim's hand and that he later planted it back in the victim's hand prior to the police arriving at the house. The pistol in the victim's hand was found with the hammer down, indicating it was not ready to shoot.

From this evidence, and the other evidence presented at the trial, the jury could have found that the Defendant was not in imminent danger when he fired the shotgun. First, the jury could have concluded that, after the victim went back inside the house, the Defendant could have left the premises to avoid the danger. Second, the jury could have concluded that the victim did not actually have the pistol in his hand and was not raising it at the Defendant when the Defendant shot him. The Defendant admits planting the gun in the victim's hand, and the jury could rightfully reject his testimony that the victim had a gun at all. By the jury's verdict it rejected the Defendant's claim that he acted in self-defense. When considered in the light most favorable to the State, we find that this record contains ample evidence from which the jury could find the Defendant guilty beyond a reasonable doubt of murder in the second degree.

**B. New Trial**

Having determined that the evidence was sufficient to support the Defendant's conviction, we now address the Defendant's contention that he is entitled to a new trial because: (1) the State lost exculpatory evidence thereby depriving him of his right to a fair trial; and (2) the trial court erred in failing to give a jury instruction on voluntary intoxication indicating that the Defendant's intoxication may be relevant to negate the necessary culpable mental state.

**1. Exculpatory Evidence**

In response to the Defendant's contention that the State lost exculpatory evidence, the State asserts that the Defendant waived this issue by not properly preserving it for appeal. Both parties agree that the Defendant did not seek relief from the trial court for the missing gunshot residue test results. The Defendant recognizes that failure to so preserve issues for appeal generally results in a waiver. See Tenn. R. App. P. 3(e), 36(a); State v. Adkisson, 899 S.W.2d 626, 636 (Tenn. Crim. App. 1994). Despite these concessions by the parties, we find that the Defendant did, in fact, preserve this issue for appeal. In the Defendant's Motion for Judgment of Acquittal or New Trial the Defendant alleged that the State "failed to properly remove and protect for testing 'gun power residue' taken from [the] hand and other portions of the victim's body." This language in the Defendant's motion preserved this issue and we will, therefore, address the issue on its merits.

The Defendant contends that the State lost evidence that would be exculpatory. To support this contention, the Defendant relies on the testimony of Robert Daniel Royse, a special agent forensic scientist with the TBI, who testified that, while another section of the laboratory was responsible for performing gun residue tests, it was his understanding that "one of the swabs on . . . the back surface of the left hand, was missing from the kit, therefore, the kit was not able to be examined." The Defendant asserts that this testimony proves that the State lost part of the gun residue testing kit and that the results of that kit would have been exculpatory and he was, therefore, denied a fair trial.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides every defendant the right to a fair trial. To facilitate this right, a defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to guilt or relevant to punishment. Brady v. Maryland, 373 U.S. 83, 87 (1963). Further, the prosecution has a duty to turn over exculpatory evidence that would raise a reasonable doubt about a defendant's guilt. United States v. Agurs, 427 U.S. 97, 110-11 (1976). The evidence in both Brady and Agurs was "plainly exculpatory" evidence, which differs from the evidence in the case under submission, which is "allegedly exculpatory."

The Tennessee Supreme Court adopted a balancing approach to determine the consequences that flow from the State's loss or destruction of allegedly exculpatory evidence in State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999). In Ferguson, the Court held that the first step in the balancing analysis is to "determine whether the State had a duty to preserve the evidence. Generally speaking, the State has a duty to preserve all evidence subject to discovery and inspection under Tenn. R. Crim. P. 16, or other applicable law." Id. at 917 (footnote omitted). The Court clarified the boundaries of the State's duty to preserve evidence by quoting California v. Trombetta, 467 U.S. 479 (1984), which held:

"Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the Defendant would be unable to obtain comparable evidence by other reasonably available means."

Ferguson, 2 S.W.3d at 917 (quoting Trombetta, 467 U.S. at 488-89).

The Court went on to state that if the proof demonstrates the existence of a duty to preserve the evidence and demonstrates that the State failed in that duty, "the analysis moves to considerations of several factors which guide the decision regarding the consequences of the breach." Id. Accordingly, those factors include: "(1) the degree of negligence or bad faith involved; (2) the significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence used at trial to support the conviction." Ferguson, 2 S.W.3d at 917 (footnote omitted). If, after considering all the factors, the trial judge concludes that a trial

without the missing evidence would not be fundamentally fair, then the trial court may dismiss the charges, this being but one of the trial judge's options. Id.

We now determine whether, in light of the considerations above, the State had a duty, which it breached, to preserve the gun residue test kit in the case under submission. As noted above, the State has a duty to preserve all evidence subject to discovery and inspection under Tennessee Rule of Criminal Procedure 16. The issue before us, though, is whether the record supports the Defendant's contention that the State failed to preserve this evidence. The Defendant relies upon a speculative statement by a TBI agent who was not responsible for the gun residue test to support his contention that part of the gun residue test kit was lost. The agent, however, made no definitive statement that any evidence was lost, and the Defendant did not call any other witnesses to attest to the fact that the evidence was lost. Therefore, we find that there is no conclusive proof in the record that the State breached its duty to preserve the evidence, because there is no conclusive proof in the record that any evidence is missing.

While this finding is dispositive of the issue before us, we find further support for our holding in that, considering the three relevant factors articulated by the court in Ferguson, the Defendant received a fundamentally fair trial. Unquestionably, the Defendant failed to prove that the State acted in bad faith if the evidence was lost. Second, the evidence was not of great significance because the Defendant testified that the victim shot at him and he, therefore, presented his defense in as complete a manner as was possible without the test results. Finally, as discussed previously, the evidence is sufficient as to the Defendant's conviction. Thus, it is clear that the Defendant was not hindered in the full and complete exposition of his theory to the jury. We conclude, therefore, that he received a fundamentally fair trial and that he experienced no measurable disadvantage because of the unavailability of the test results.

## 2. Voluntary Intoxication

The Defendant failed to raise his next issue, whether the trial court erred in not giving a jury instruction regarding the relevance of the Defendant's intoxication to negate his culpable mental state, in his Motion for New Trial. The Defendant's failure to raise the issue in his Motion For a New Trial precludes our review of this issue, subject to our noticing "plain error." See Tenn. R. App. P. 3(e) (providing that "no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in the motion for new trial. . . . ); Tenn. R. App. P. 36(a) (providing that relief is not required for a party who failed to take reasonably available action to prevent or nullify an error).

Pursuant to Rule 52(b) of the Tennessee Rules of Criminal Procedure, we have discretion to notice an error that has affected the substantial rights of an accused when necessary to do substantial justice. State v. Adkisson, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). Before an error may be recognized it must be "plain" and must affect a "substantial right of the accused. The word "plain" is synonymous with "clear" or equivalently "obvious." United States v. Olano, 507 U.S. 725, 732 (1993). Plain error is not merely error that is conspicuous, but

especially egregious error that strikes at the fairness, integrity, or public reputation of judicial proceedings. See State v. Wooden, 683 S.W.2d 553, 559 (Tenn. Crim. App. 1983). When considering whether "plain error" exists we consider the following factors:

> (a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached;
> (c) a substantial right of the accused must have been adversely affected;
> (d) the accused did not waive the issue for tactical reasons; and
> (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000) (adopting the test articulated by the Court of Criminal Appeals in Adkisson, 899 S.W.2d at 641-42 ). All five factors must be established by the record before an appellate court will recognize the existence of "plain error," and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established. Id. In addition, the "'plain error' must [have been] of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642.

After a thorough review of the record in this case, we conclude that the "plain error" doctrine cannot afford the Defendant relief. Although voluntary intoxication is not itself a defense to second degree murder, it is relevant to negate a culpable mental state. See Tenn. Code Ann. §39-11-503(a). The trial court did not instruct the jury that voluntary intoxication is relevant to negate a culpable mental state, but its failure to do so does not constitute "plain error" because, for the reasons hereinafter set out, such an instruction was not warranted under the facts of this case. Therefore, the failure to give the jury an instruction on voluntary intoxication is not a breach of a clear and unequivocal rule of law, and thus does not rise to the level of "plain error."

The Defendant correctly notes that "it is the duty of the trial court, without request, to instruct the jury on rules of law governing every issue raised by the evidence." See Poe v. State, 370 S.W.2d 488, 489 (1963); State v. Locke, 771 S.W. 2d 132, 138-39 (Tenn. Crim. App. 1988). However, as the State points out, "[p]roof of intoxication alone . . . does not entitle an accused to jury instructions . . . there must be evidence that the intoxication deprived the accused of the mental capacity to form specific intent . . . ." Harrell v. State, 593 S.W.2d 664, 672 (Tenn. Crim. App. 1979). In our view, the record does not contain evidence proving that the Defendant's elevated blood alcohol level rendered him incapable of acting "knowingly."

While the proof was uncontradicted that the Defendant had a blood alcohol level of point one nine percent when tested after the shooting, no expert testified as to how this may have impaired the Defendant's ability to act knowingly. TBI Agent King testified that alcohol levels like those found the Defendant could affect the body and that a person in such a state "could have altered gait, blurred vision, decrease in critical judgment, increase in reaction time, there could be a loss of inhibitions." However, neither she nor any other expert testified that alcohol levels like those found in the Defendant would affect his ability to act knowingly. Further, the

Defendant himself testified that he drove the victim home because the victim was "too drunk to drive," implying to the jury that the Defendant was not.

We also reject the Defendant's assertion that the reason he was tested for blood alcohol level that night was due to his behavior. Deputy Mercer testified that the blood and urine tests were performed "because there had been a killing." We, therefore, find nothing in the testimony that would compel the trial court to give a jury charge on the possible effects of intoxication on the Defendant's mental capacity. The Defendant's theory of defense was self-defense, and, notwithstanding the great deal of evidence presented relevant to that theory, the jury chose to reject the Defendant's claim of self-defense. The Defendant did not claim at trial that he was too intoxicated to act knowingly, and the evidence, in our view, does not support such a claim.

Because we find that the Defendant failed to establish that a "clear and unequivocal rule of law has been breached," which is one of the five factors necessary to prove "plain error," we hold that the trial court did not commit "plain error" when it failed to instruct the jury on the relevance of voluntary intoxication to the formation of the Defendant's culpable mental state. This issue is without merit.

### III. Conclusion

Based on the foregoing, we find no reversible error. Accordingly, the judgment of the trial court is AFFIRMED.

_____
ROBERT W. WEDEMEYER, JUDGE